**UNITED STATES of America**

v.

**Ana GONZALEZ, Defendant.**

**No. 89 Cr. 535 (CSH).**

United States District Court, S.D. New York.

Dec. 1, 1989.

Otto G. Obermaier, U.S. Atty. for S.D. N.Y., New York City, for plaintiff (Mark Stein, of counsel.)

Aranda & Guttlein, New York City, for defendant (Jorge Guttlein, of counsel.)

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant Ana Gonzalez is charged in a one-count information [1] with violating 21

---

1. The defendant was originally charged by way of a one-count indictment with violating 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 845a(a). On November 6, 1989, defendant was arraigned on the superseding information to which she entered a plea of not guilty. Defendant waived the right to a superseding indictment.

The superseding information differs from the original indictment only insofar as it alleges a

U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C) and 845a(a). Gonzalez now moves to suppress physical evidence and certain statements made after her arrest.[2]

This Court held an evidentiary hearing on October 11, 1989 and heard closing arguments of counsel on November 6, 1989. The question has been fully briefed and is now ripe for decision.

## Background

On June 29, 1989, Detective Henry Gary arrested the defendant in the Port Authority Bus Terminal. Gonzalez was carrying a quantity of narcotics in her handbag, specifically heroin. Defendant contends that her handbag was searched and the contraband seized in violation of the fourth amendment. She therefore argues that the narcotics must be suppressed.

On that June date, Gary was assigned to gate 67 of the terminal. Gary was a detective with the drug interdiction program, which he describes as "a program that is set up under the guidelines of the federal government to prevent the traversing of drugs in the Port Authority, to prevent it from being brought into Port Authority or taken out by way of Port Authority." Tr. at 7.[3] Gary and his partner, Charles Benoit, were "assigned to observe passengers and see if [they] could pick out someone that was acting different from the other passengers" with an eye toward singling out people transporting narcotics. *Id.* at 8.

Gary and his partner watched the defendant for fifteen minutes as she waited, at gate 67, to board a bus headed for Philadelphia and beyond. Gary testified that a series of factors led him to approach the defendant. Specifically, Gary alleges that the defendant clutched her handbag in front of her chest in a protective manner.

Further, Gary states that he observed the outline of a rectangular shaped object through the bag, which he thought might be a form of drug packaging known as a "brick." Gary testified that during the time in which he observed the defendant she continuously looked around in a nervous manner. Gary also states that Gonzalez was on line with another woman who was standing within a few inches of the defendant and walking backwards on line. According to Gary's testimony, this second woman was also acting in a nervous manner. Finally, the defendant and the woman with whom she appeared to be travelling were not carrying luggage. The sum of these factors led Gary to suspect Gonzalez of drug trafficking. He therefore approached the defendant in order to question her about narcotics.

The factual account given by detective Gary and defendant Gonzalez of the events following Gary's approach of the defendant differs in significant respects. Because I view Gary's account to be more plausible and because I found him to be a more credible witness, I credit his testimony in full. The factual account which follows is therefore that given by Gary.

Gary and his partner were in plain clothes and Gary testified that his gun was under his shirt and was not visible. Tr. at 48. Both Gary and his partner approached the defendant immediately after she passed through the gate in order to board the bus. Gary identified himself to the defendant as a police officer. On direct examination by government counsel, Gary described the encounter as follows:

Q. What if anything happened when Miss Gonzalez and the other woman reached the gate?

---

violation of 21 U.S.C. § 841(b)(1)(C), rather than § 841(b)(1)(A). That change reflects a decrease in the weight of the drugs which the government charges defendant with possessing. Specifically, the indictment charged defendant with possession, within 1,000 feet of a school, of greater than one kilogram of heroin. However, more accurate testing revealed its weight to be less than one kilogram.

**2.** In the memorandum of law accompanying her notice of motion, defendant also applies for

an order "granting discovery as requested in the attached motion." However, the notice of motion makes no specific reference to any discovery disputes, and counsel have brought none to the attention of this Court. Therefore, defendant's discovery motion is denied on the present record.

**3.** Tr. refers to the transcript of the evidentiary hearing held on October 11, 1989.

A. When they reached the gate, the other lady presented her ticket to the bus driver, the bus driver returned her stub, and she did not step on the bus, she just stepped over to the side while Miss Gonzalez did her transaction with the bus driver.

Q. And then what happened?

A. When Miss Gonzalez completed her transaction, they both moved, began to move toward the bus, at which time I stepped over and asked if I could speak to them.

Q. Why did you do that?

A. That's the procedure. You identify yourself, you show your shield, and you then engage in conversation with the person that you would like to talk to about drugs.

Tr. at 16–17.

Gary describes the events following the display of his shield as follows:

Q. What happened next?

A. As I identified myself basically to Miss Gonzalez, she stated "No speak English."

Q. Officer Gary, do you speak any Spanish?

A. Just basic words.

Q. What did you say to her next, if anything?

A. I then, while still holding my shield up I said "La policia."

Q. What was her response, if any?

A. Then she said "Oh, La policia."

Q. What did she do next?

A. At this time I knew that I couldn't engage in that much conversation with her about the drug interdiction program. So this time I said the word "Drugs," and I pointed to her purse.

Q. What was her response to that, if any?

A. Then she replied, her face—you know, I could tell that she recognized the word "Drugs," and she said "No, no, no drugs," at which time she opened up her bag and presented to me the back portion

of her bag, to show me that she was not carrying drugs.[4]

Q. When you say presented to you, what do you mean?

A. I mean on her own she had the bag, she put it out to me where I could see it.

Q. Did she open up the part of her bag that was closest to her stomach or away from her stomach?

A. The part that was closest to her stomach.

Q. Did you look into the bag?

A. I looked into the real [sic; should be "rear"] compartment she was showing me, whereupon I observed a hair brush and female cosmetics.

Q. Does that portion of the purse have a zipper on it?

A. No, it does not.

Q. Did you see anything in there besides cosmetics?

A. No, I did not.

*Id.* at 17–19.

Gary testified that after the defendant voluntarily opened that portion of her handbag which contained only cosmetics, the following exchange took place:

Q. What happened next?

A. At this point I again said the word very loud "Drugs," and with my index finger of my right hand I pointed to the front portion of her bag.

Q. Then what happened?

A. At this time she removed the bag, the strap from over her neck, she unzipped it from right to left, and presented it to me in this fashion.

Q. Again, presenting it to you meaning what?

A. With her arms extended and the bag open, she held it up to me.

Q. What if anything did you see?

A. I saw a gray piece of material, of which the rectangular form of the package was presented to me, covered by a gray piece of material.

---

**4.** Gonzalez also testified that she opened up the back portion of her handbag for Gary. Tr. at

128.

Q. What were you pointing at when you pointed the second time and said "Drugs"?

A. The second time I said "Drugs," I was pointing to the front compartment of the bag, which was closed. I said "Drugs," and I actually took my index finger and I pointed her here.

She then removed the bag, she unzipped it. The bag was heavily stuffed, it was very well stuffed. She unzipped it and she held it out like this as to say—she didn't say anything but she held it out like this. While she was holding it out like this I observed the gray material, but it was covering a rectangular shaped object and the object was very clear to me then. I took my hand and I felt the gray piece of material.

*Id.* at 19–20.

After Gary viewed the rectangular shaped object covered by the gray material, he put his hand into the handbag.

Q. After you saw the blouse [gray material], what did you do next?

A. After I saw the blouse, while she was still holding the bag out, with my hand I felt the rectangular shaped object.

Q. Could you describe what the object felt like to you?

A. The object felt like decks of heroin, bundles, packages of heroin, bounded together by rubber bands.

Q. Could you feel the rubber bands?

A. Yes, I could.

Q. Could you feel the separate decks?

A. Yes, I could.

*Id.* at 21–22.

After feeling the "decks" of heroin, Gary removed the rectangular object from the purse and unwrapped it. Upon viewing what appeared to be drugs, Gary placed Gonzalez under arrest and read her her *Miranda* rights in English. *Id.* at 26. After reading Gonzalez her rights, Gary transported her to headquarters, located in the same building complex as the bus terminal.

Upon arriving at headquarters, Ava Cooper–Davis, a Spanish speaking agent of the DEA, was called. She read Gonzalez her *Miranda* rights in Spanish. Tr. at 91. Subsequent to giving the defendant her rights, Cooper–Davis questioned Gonzalez about her personal history and again read her her *Miranda* rights in Spanish. Indeed, the defendant signed her name to the rights card, Tr. at 95, indicating that she had been informed of and understood her rights.

### Discussion

The government argues that the initial encounter between Gary and the defendant did not constitute a seizure and is thus not subject to fourth amendment analysis. Alternatively, the government argues that the encounter was supported by the requisite degree of reasonable suspicion. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). I first address whether the defendant was seized within the meaning of the fourth amendment.

In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), a so-called drug courier case, Justice Stewart wrote on the question of whether the defendant in that case had been seized.

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall, supra* at 554–55, 100 S.Ct. at 1877 (footnote omitted) (citations omitted). Although that portion of the Court's opinion dealing with whether the defendant had been seized was joined only by Justice Rehnquist, it was later followed by the

Court in *Florida v. Rodriquez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (per curiam).

Of course, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry, supra* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Rather, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* Further, the subjective intent of the officer in respect of whether the defendant is free to leave is irrelevant except insofar as that subjective intent has been conveyed to the defendant. *Mendenhall, supra* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6.

*Mendenhall* presented a factual scenario similar to that at bar. In that case, the respondent, who had just arrived at the Detroit Metropolitan Airport from Los Angeles, was observed by two agents of the DEA. Those agents "were present at the airport for the purpose of detecting unlawful traffic in narcotics." 446 U.S. at 547, 100 S.Ct. at 1873. Upon observing conduct "characteristic of persons unlawfully carrying narcotics", *id.,* the agents approached the respondent.

> [T]he agents approached her as she was walking through the concourse, identified themselves as federal agents, and asked to see her identification and airline ticket. The respondent produced her driver's license, which was in the name of Sylvia Mendenhall, and, in answer to a question of one of the agents, stated that she resided at the address appearing on the license. The airline ticket was issued in the name of "Annette Ford." When asked why the ticket bore a name different from her own, the respondent stated that she "just felt like using that name." In response to a further question, the respondent indicated that she had been in California only two days. Agent Anderson then specifically identified himself as a federal narcotics agent and, according to his testimony, the respondent "became quite shaken, extremely nervous. She had a hard time speaking."

*Id.* at 547–48, 100 S.Ct. at 1873–74. Writing for himself and Justice Rehnquist, Justice Stewart concluded that "[o]n the facts of this case, no 'seizure' of the respondent occurred." Justice Powell, writing for himself, Chief Justice Burger and Justice Blackmun, concurring in part and in the judgment of the Court, said the following:

> MR. JUSTICE STEWART concludes in Part II–A that there was no "seizure" within the meaning of the Fourth Amendment. He reasons that such a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." MR. JUSTICE STEWART also notes that " '[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets,' " I do not necessarily disagree with the views expressed in Part II–A. For me, the question whether the respondent in this case reasonably could have thought she was free to "walk away" when asked by two Government agents for her driver's license and ticket is extremely close.

*Id.* at 560 n. 1, 100 S.Ct. at 1880 n. 1 (Powell, J., concurring). Thus, there was no majority consensus on the question of whether Mendenhall had been seized. However, only two justices concluded that she had not been seized, while three viewed it to be a close question.

The government offers the following facts in support of the argument that Gonzalez was not seized within the meaning of the fourth amendment. The government points to the fact that the encounter occurred in a public place and that the detectives were both in plain clothes rather than in uniform. The government further relies on the fact that Gary's gun was concealed under his shirt and not displayed in a threatening manner. Gonzalez was not taken to another part of the terminal during the encounter and was not physically removed from the line.

Defendant counters with her own litany of facts in support of the contention that

she was seized prior to the search of her handbag. As Gonzalez was about to board the bus for Philadelphia, both Gary and his partner Charles Benoit approached her while displaying their shields. Defendant Gonzalez stands approximately four feet eleven inches tall, as compared to detective Gary, who is over six feet tall, a difference of more than a foot. Gary's partner is five feet ten inches tall. Gonzalez speaks no English and upon understanding that fact Gary gave up on his plan of engaging the defendant in a discussion about the drug interdiction program and instead began to point to her handbag while repeating the word "drugs". After the defendant opened that portion of the bag which contained only cosmetics, Gary loudly repeated the word "drugs" and again pointed to the defendant's handbag. Tr. at 19. Throughout this encounter Benoit was positioned in front of the bus, blocking the defendant's path to the bus. Tr. at 69.

■ However, the question of whether a seizure occurred cannot be answered by running through a checklist, nor by balancing the number of factors that point in favor of as against those which point away from finding a seizure. As the Court itself noted, the objective criteria listed in *Mendenhall* were merely "examples" of those things which might assist a court in determining whether a seizure occurred. 446 U.S. at 554, 100 S.Ct. at 1877. They were clearly not meant as an exhaustive list of relevant considerations.

■ Given the obvious language barrier, compounded by the fact that Gary repeatedly and in increasingly loud tones said the word "drugs" while pointing to defendant's handbag, all while his partner seemingly blocked defendant's route to the bus,[5] it cannot fairly be said that Gonzalez would have believed that she was free to leave.[6] It is certainly true that a police officer may engage in a conversation with a citizen

without implicating the fourth amendment, but the interaction between Gary and the defendant, in light of the surrounding circumstances, cannot rightly be characterized as a conversation. The "close call" presented by the facts of *Mendenhall* is not present in the instant case. The additional factors of a language barrier, a significant difference in size between the officers and the defendant, and the officer's continued repetition of the word drugs while pointing to defendant's handbag necessitate the finding of a seizure, subject to fourth amendment scrutiny.

■ I turn then to the question of whether the seizure was justified by that level of reasonable suspicion required by the fourth amendment. *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam) is instructive in that regard. The facts of that case were as follows:

The petitioner arrived at the Atlanta Airport on a commercial airline flight from Fort Lauderdale, Fla., in the early morning hours of August 14, 1978. The passengers left the plane in a single file and proceeded through the concourse. The petitioner was observed by an agent of the DEA, who was in the airport for the purpose of uncovering illicit commerce in narcotics. Separated from the petitioner by several persons was another man, who carried a shoulder bag like the one the petitioner carried. As they proceeded through the concourse past the baggage claim area, the petitioner occasionally looked backward in the direction of the second man. When they reached the main lobby of the terminal, the second man caught up with the petitioner and spoke briefly with him. They then left the terminal building together.

The DEA agent approached them outside of the building, identified himself as

---

**5.** Gary testified that as he was "piercing the paper bag" in Gonzalez's handbag, Benoit "was still standing in his position ... over by the bus, the door of the bus." Tr. at 69.

**6.** Gonzalez testified that Gary seized her arm, dragged her out of line, and forcibly deprived

her of her handbag. Tr. at 127–29. If I credited this testimony, it would clearly establish a "seizure". I do not credit it, for the reasons previously stated. But that does not alter conclusion that, in the circumstances described by Gary, a reasonable person in Gonzalez's position would not have believed herself free to leave.

a federal narcotics agent, and asked them to show him their airline ticket stubs and identification, which they did. The airline tickets had been purchased with the petitioner's credit card and indicated that the men had stayed in Fort Lauderdale only one day. According to the agent's testimony, the men appeared nervous during the encounter. The agent then asked them if they would agree to return to the terminal and to consent to a search of their persons and their shoulder bags. The agent testified that the petitioner nodded his head affirmatively, and that the other responded, "Yeah, okay." As the three of them entered the terminal, however, the petitioner began to run and before he was apprehended, abandoned his shoulder bag. The bag, when recovered, was found to contain cocaine.

*Reid*, 448 U.S. at 439, 100 S.Ct. at 2753. Based on the following basic factors, the court below found that the requisite degree of reasonable suspicion was present.

(1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags.

*Id.* at 441, 100 S.Ct. at 2754.

The Supreme Court reversed in *Reid*, "conclud[ing] that the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." *Id.* The Court went on to say the following:

Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse related to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to

virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.

*Id.* The case at bar is on par with *Reid*. All of the five factors which led Gary to approach Gonzalez are wholly consistent with lawful activity. It is certainly true that there could be a compilation of "wholly lawful conduct [which] might justify the suspicion that criminal activity was afoot", *id.* (citation omitted), but this is not such a case.

Apart from the visible outlines of a rectangular shaped object through the defendant's handbag, all of the factors on which Gary relied were present in *Reid* and the Supreme Court emphatically rejected their sufficiency under the fourth amendment. Therefore, the question is whether the addition of the rectangular shaped object changes the balance of the equation. Clearly, it was this object which resulted in Gonzalez being singled out, as the other woman with whom she was allegedly travelling was never approached despite the fact that she exhibited the same nervousness as the defendant and was also not carrying luggage.

As regards the outlines of the rectangle visible through the defendant's handbag, Gary testified on cross-examination as follows:

Q. So in other words it is your testimony that drugs don't come in any particular shape, they could come in any shape?

A. Basic drugs come in a square or rectangular shape.

Q. But it could be any other shape, is that correct?"

A. It could be any other shape, yes.

Q. In fact a brick could also be a Christmas package or a package of food or something else, could it not be?

A. It's highly possible.

Q. So the shape you saw was rectangular. In other words, it didn't look exactly like a brick of cocaine, did it?

A. From my point of view, it looked like a key of cocaine, a kilo of cocaine.

Q. But when you approached Miss Gonzalez, you didn't arrest her right away, is that correct?

A. No, I did not.

Q. So you weren't sure what it was, were you?

A. I didn't know what it was at all. I was on a drug interdiction program and my mind was focused on looking for drugs and arresting those that would have it. So naturally when I see that object with the detail that I have, I am concentrating on drugs.

Tr. at 56–57. In other words, Gary concedes that the rectangular object could have been a Christmas gift as easily as a brick of heroin. There was nothing about the shape that distinguished it as uniquely drug packaging. Indeed, Gary "didn't know what it was at all", but because his mind was focused on his professional responsibilities, namely finding and arresting those trafficking in narcotics, he was more apt to see the package as drugs than as a lawful possession, such as a book or a gift of some sort. It is a form of tunnel vision, entertained in good faith or perhaps even subconsciously, but nonetheless limiting. Without more particularized and objective facts, the carrying of an unidentified object with a rectangular shape which protrudes from a person's handbag cannot, even in combination with the other equally innocent circumstances cited by the government, give rise to that level of reasonable suspicion required by the fourth amendment.

I therefore hold that the search of defendant's handbag, whether or not it was based on consent, a question I need not and do not address in the view I take of the case, was invalid and the physical evidence seized as a result of that search must be suppressed. Interdicting the flow of drugs is of primary public importance; but an officer seizing a citizen must articulate reasons which pass constitutional scrutiny. The reasons at bar fail the test.

I further hold that the post-arrest statements made by the defendant must also be suppressed as the fruit of the poisonous tree that was the illegal search and seizure of defendant Gonzalez.

Defendant's motion to suppress is granted in its entirety.

The foregoing is SO ORDERED.